**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GERMAN AROCHI, individually and on behalf of all others similarly situated, | Case No.: |
| Plaintiff, | |
| vs. | **CLASS ACTION COMPLAINT** |
| UNICOIN, INC. f/k/a TransparentBusiness, Inc.; ALEXANDER KONANYKHIN; MARIA SILVINA MOSCHINI; ALEJANDRO DOMINGUEZ; and RICHARD DEVLIN, | **JURY TRIAL DEMANDED** |
| Defendants. | |

**INTRODUCTION**

Plaintiff German Arochi ("Plaintiff") brings this Complaint individually and on behalf of all others similarly situated, against Unicoin, Inc. f/k/a TransparentBusiness, Inc. ("Unicoin"), Alexander Konanykhin ("Konanykhin"), Maria Silvina Moschini ("Moschini"), Alejandro Dominguez ("Dominguez"), and Richard Devlin ("Devlin") (Unicoin, Konanykhin, Moschini, Dominguez and Devlin are referred to collectively as "Defendants"), and alleges as follows upon personal knowledge as to himself and his own acts and experience, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys, which includes but is not limited to: (a) Documents filed in *SEC v. Unicoin, Inc. et al.*, 1:25-cv-04254 (S.D.N.Y. May 20, 2025); (b) Documents obtained by Plaintiff and other putative class members from Defendants; (c) Documents and materials produced to the public at large when Unicoin, Inc. was selling unregistered securities; and (d) Review of other publicly available information concerning Defendants.

## PRELIMINARY STATEMENT

1.      Plaintiff brings this action on behalf of persons and/or entities who purchased or otherwise acquired Unicoin Rights Certificates (the "Certificates") from Defendants.

2.      Defendants orchestrated and engaged in a fraudulent scheme to market and sell Certificates that promised to provide purchasers with "asset-backed" and "equity-backed" cryptocurrency tokens ("Unicoin tokens"), if and when such tokens were created.

3.      Defendants falsely represented the Certificates as "asset-backed" and "equity-backed," when in reality, Defendants' representations were materially false and misleading, as Unicoin held only a fraction of the real estate it claimed to own, and the Unicoin tokens at the center of the scheme were never issued.

4.      Defendants' marketing efforts broadly utilized digital billboards, television ads, and social media platforms to solicit more than $100 million from investors worldwide. Defendants targeted New York in particular, with ads in New York City taxis, buses, ride-share cars, New York Waterway ferries, LinkNYC public wi-fi kiosks, office building elevator screens in New York City, digital billboards in public spaces such as Times Square, and all three major New York City-area airports. These marketing efforts were part of a broader scheme to create the illusion of a legitimate, profitable investment opportunity while concealing the truth about the Certificates being offered.

5.      Defendant Konanykhin also regularly issued so-called "Investor Updates" throughout the relevant period, posting them to the Company's public website. These periodic promotional communications, authored by Defendant Konanykhin, were disseminated to the Company's email distribution list of actual and potential investors, as well as others who signed up for updates and provided Unicoin with their contact information, to spur public interest in the

Certificates.

6.      Defendants also posted so-called private placement memoranda ("PPMs") on their public website as solicitations throughout the relevant period, as well as hundreds, if not thousands, of posts on Twitter/X, Instagram, Facebook, LinkedIn, and Unicoin's website, all of which were publicly accessible, highly misleading promotional materials.

7.      Defendants' public advertisements, PPMs, Investor Updates, and social media posts were all part of a vast marketing campaign designed to lure buyers for the Certificates. As detailed herein, they were all filled with lies.

8.      Defendants also engaged in public relations activities to maintain the illusion of an impending Unicoin IPO, including posting pictures of themselves at the Nasdaq and NYSE stock exchanges on Unicoin's and their own social media accounts, and conducting paid interviews at the Nasdaq and NYSE exchanges in front of backgrounds displaying the Nasdaq and NYSE logos.

9.      In 2024 alone, Unicoin's "sales and marketing expenses" – which consisted of "third-party marketing, advertising, and branding in addition to compensation and benefits of the Company's own marketing personnel" – exceeded $14 million. Unicoin spent approximately $6 million on sales and marketing in 2023 and approximately $17.8 million in 2022.

10.     Defendants' extensive marketing campaign conveyed the false and misleading impression that the Unicoin Rights Certificates constituted safe, legally compliant, and highly sought-after "next-generation" crypto assets.

11.     In reality, however, the Unicoin Rights Certificates were nothing more than worthless unregistered securities that Defendants issued in violation of state and federal law, and almost everything that Defendants said when promoting them to unsuspecting investors was a lie.

12.     Plaintiff and the Class were misled by Defendants' false statements and material

omissions, which included misrepresentations about the profitability, functionality, and value of Certificates and Unicoin tokens, as well as the risks associated with purchasing them. As a result, Plaintiff and the Class suffered significant economic damages.

13.    The truth began to emerge on May 20, 2025, when the Securities and Exchange Commission ("SEC") filed a complaint (the "SEC Complaint") against Unicoin, Konanykhin, Moschini, Dominguez, and Devlin for engaging in a "massive securities offering fraud" in violation of Sections 5 and 17 of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934.[1]

14.    Now aware of the truth, Plaintiffs bring this action to recover the damages incurred as a result of Defendants' extensive and deceptive marketing scheme.

<u>**JURISDICTION AND VENUE**</u>

15.    This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because: (1) there are 100 or more (named or unnamed) class members; (2) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest or costs; and (3) there is minimal diversity because at least one plaintiff and defendant are citizens of different states).

16.    This Court may exercise personal jurisdiction over Defendants because Defendants either reside in or maintain business in this District, maintain and have continuous and systematic contacts with this District, do substantial business in this State and within this District, and engage in unlawful practices in this District as described in this Complaint, so as to subject themselves to personal jurisdiction in this District, thus rendering the exercise of jurisdiction by this Court proper and necessary.

17.    Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and (c) and

---

[1] *See* Complaint, *SEC v. Unicoin, Inc. et al.*, 1:25-cv-04254 (S.D.N.Y. May 20, 2025).

4

18 U.S.C. § 1965. Defendants centered their misconduct in this Judicial District and promoted, advertised, and hyped up the worthless Certificates in this Judicial District. Moreover, subsequent damage occurred in this Judicial District.

18.     Additionally, venue and jurisdiction are proper in this District because many of the acts complained of herein, including the dissemination of materially false and misleading statements, originated and/or occurred, at least in part, in this Judicial District. Further, Defendants sought investors in this Judicial District and encouraged them to invest in the Certificates.

## THE PARTIES

### Plaintiff

19.     Plaintiff German Arochi is an adult individual who is a resident and domiciliary of Yucatán**,** Mexico. During the Relevant Period, Plaintiff invested in unregistered securities that were promoted and offered by Defendants.

### Defendants

20.     Defendant Unicoin, Inc. f/k/a TransparentBusiness, Inc. ("Unicoin" or "the Company") is a Delaware corporation formed in June 2015, which is engaged in the business of marketing, selling, and issuing unregistered securities. Unicoin maintains its principal place of business at 228 Park Avenue South, New York, NY 10003.

21.     Defendant Alexander Konanykhin ("Konanykhin") is an adult individual who has served as Unicoin's Chief Executive Officer ("CEO") since 2015 and as Chairman of its Board of Directors since March 2024. Konanykhin owns 36% of Unicoin's common stock and controls the Company's operations and decision-making. All senior Unicoin executives report directly or indirectly to him. Konanykhin was married to Defendant Maria Silvina Moschini until 2022. During the Relevant Period, including from at least 2023 to at least June 2024, Konanykhin was a

resident of Sunny Isles Beach, Florida; his current residence is unknown.

22.     Defendant Maria Silvina Moschini ("Moschini") is an adult individual who served as president of Unicoin and chairwoman of the Company's board of directors from June 2015 to March 2024. Moschini left Unicoin's board of directors in March 2024 and rejoined the board on or about June 28, 2024. Moschini owns 36.6% of Unicoin's common stock and was married to Konanykhin until 2022. During the Relevant Period, including from at least 2021 to January 2025, Moschini was a resident of Miami Beach, Florida; her current residence is unknown.

23.     Defendant Alejandro Dominguez ("Dominguez") is an adult individual who was Unicoin's Chief Investment Officer from December 2023 through August 2024. Dominguez served as Unicoin's Investor Relations Officer from April 2022 to December 2023 and was the Company's Vice President of Corporate Development from March 2022 to April 2022. He is a resident of Miami, Florida.

24.     Defendant Richard Devlin ("Devlin") is an adult individual and resident of Atglen, Pennsylvania, who served as senior vice president and general counsel of Unicoin from June 2020 until resigning from the Company on May 19, 2025. The SEC Complaint against Unicoin charged Devlin with violating the federal securities laws by negligently making misstatements in private placement memoranda that the Company used to offer and sell rights certificates and common stock. On May 20, 2025, Devlin agreed to pay a $37,500 civil penalty to the SEC without admitting or denying the allegations of the Complaint.

## FACTS

### Background on Unicoin, Inc. and its Subsidiaries

25.     Unicoin, Inc. was incorporated in Delaware on June 22, 2015, under the name "Transparent Business, Inc."

26.     Transparent Business, Inc. changed its name to Unicoin, Inc. on October 6, 2022. To avoid confusion, this Complaint refers to both Transparent Business, Inc. and Unicoin, Inc. as "Unicoin" or "the Company."

27.     Unicoin was originally a software-as-a-service ("SaaS") business that provided proprietary software for monitoring and managing remote workforces in the United States and abroad. The Company later acquired ownership interests in two talent-as-a-service ("TaaS") businesses.

28.     In January 2018, Unicoin acquired a 100% ownership interest in SheWorks!, a freelance talent exchange platform founded by Moschini.

29.     In November 2020, Unicoin acquired a 51% majority ownership interest in ITSQuest, Inc., a traditional staffing agency servicing the southwestern United States.

30.     In April 2021, Unicoin acquired a 66.67% ownership interest in Unicorns, Inc., a media production company founded by Konanykhin that produced a reality streaming series called "Unicorn Hunters."[2]

31.     "Unicorn Hunters" showcased private startup companies seeking publicity and funding for their private securities offerings. In exchange for featuring these private companies, Unicorns, Inc. received equity interests, stock options, or warrants in certain of the potential "unicorns" that appeared on the show.

32.     The title of the "Unicorn Hunters" series is a play on the concept of "unicorn" companies, which are private startup firms valued at $1 billion or more.[3]

---

[2] Unicoin's 2024 Form 10-K for the year ended December 31, 2024, indicates the Company's ownership stake in Unicorns, Inc. increased from 66.67% to 71.88%.
[3] *See*, *e.g.*, "What is a unicorn company and what it takes to be in the club," available at https://finance.yahoo.com/news/unicorn-company-takes-club-143900058.html.

33.     Between November 2021 and December 2023, Unicorns, Inc. acquired minority interests in seven private companies that appeared on "Unicorn Hunters."

34.     Unicoin's annual report for the year ended December 31, 2024, valued these private interests at $8,163,528; the maximum value reported on any Form 10-K or 10-Q for such interests never exceeded $10,136,528.

35.     In representations to investors and potential investors, Unicoin repeatedly asserted that the Company's future cryptocurrency tokens would be backed by a portfolio of equity interests, including valuable "pre-IPO" startups acquired via the "Unicorn Hunters" series.

36.     Unicoin presented these equity interests as a central selling point for investors. The Company marketed its cryptocurrency token as "asset-backed" or "equity-backed," asserting that holders of the token would own shares in a "diversified global innovation fund" and receive dividends from a to-be-formed subsidiary of Unicoin.

37.     Unicoin claimed it would leverage the anticipated popularity of "Unicorn Hunters" to supplement the overarching Unicoin brand and increase the value of the Certificates and Tokens.

38.     As of July 2025, Unicorns, Inc. has produced one season of "Unicorn Hunters," consisting of 16 individual episodes. The first episode premiered on May 10, 2021, and the most recent episode is dated December 4, 2023.[4]

**Defendants' Fraudulent Scheme to Market and Sell Unicoin Rights Certificates**

39.     In or around February 2022, Unicoin shifted the core focus of its business to developing, offering, and promoting the Unicoin cryptocurrency token, which was to be issued through a future initial coin offering, or "ICO."

40.     Defendants repeatedly described Unicoin Tokens as "asset-backed" or "equity-

---

[4] All episodes of "Unicorn Hunters" are available at https://unicornhunters.com/episodes.

backed," claiming that the token's value was tied to Unicoin's equity positions in emerging private companies and a collection of real estate assets.

41.    Defendants portrayed Unicoin as a "value-backed superior alternative" to Bitcoin and Ethereum, as well as other popular crypto tokens.

42.    Private placement memorandums ("PPMs") and marketing materials produced and distributed by Unicoin described the tokens as "dividend-paying."

43.    Since the Unicoin Tokens did not yet exist, investors could not purchase them directly. Instead, investors interested in acquiring Unicoin tokens had to invest in Unicoin Rights Certificates, which the Company promoted as certificates that conveyed the right to receive the tokens if and when they were minted and distributed.

44.    Defendants marketed Unicoin Rights Certificates as profitable investments, creating a reasonable expectation of profits for actual and potential investors.

45.    Defendants made numerous statements painting Unicoin Rights Certificates and Unicoin tokens as lucrative investment opportunities, including:

> [S]ocial media and website posts that touted ***potential returns of 9,000,000% based on bitcoin's 9,000,000% growth in the past 10 years*** and told investors to "take advantage of the early days of Unicoin and get them today," highlighting that "Bitcoin experienced a tremendous rise in value, transforming early adopters into millionaires, and even billionaires;"

> February and March 2022 Investor Updates that pitched Unicoin tokens (and therefore Unicoin Rights Certificates) as ***opportunities to invest in a token "backed by a growing portfolio of equity stakes in emerging growth companies***;"

> advertisements and website posts that touted ***"potential values" and "potential returns" commensurate with the purported $1 trillion market value of bitcoin at the time***, including advertisements on coasters distributed at New York City bars specifically touting a "potential value" of $4,000, or $40 per coin, when Unicoin Rights Certificates had never sold for even $1.00.

SEC Complaint at para. 63 (emphasis added).

46.    Unicoin primarily offered Certificates to investors through PPMs, which promised equivalent rights to the underlying Unicoin tokens once such tokens were minted and distributed.

47.    The sale of the Certificates played a crucial role in raising capital for Unicoin, Inc. and accounted for the vast majority of the Company's reported revenue since February 2022.

48.    Unicoin has raised more than $100 million from approximately 5,000 investors worldwide through the sale of the Certificates.

**Defendants Misrepresent Unicoin's Real Estate Acquisitions**

49.    During the relevant period, Defendants repeatedly misrepresented Unicoin's ownership of and/or the value of real estate assets that Unicoin claimed to have acquired pursuant to what was known as the "140% program."

50.    Under its 140% program, the Company "would offer to pay 140% of the appraised value of real estate in Unicoin Rights Certificates, at the current price at which Unicoin was selling those rights certificates."[5] Konanykhin first announced the 140% program in April 2023, and Unicoin promoted the program through various channels, including the internet, social media, press releases, and paid promotional interviews.[6]

51.    The SEC Complaint provides a detailed description of the key roles played by Defendants Dominguez, Konanykhin, Devlin, and Moschini in the 140% program between mid-2023 and 2024, stating:

> As the Company's chief investment officer, ***Dominguez oversaw the 140% program and was primarily responsible for reviewing proposed real estate transactions***, tracking the status of such transactions, and ensuring receipt of all required documentation (including appraisals and deeds).
>
> As the Company's CEO, ***Konanykhin was also actively involved in Unicoin's proposed real estate transactions***. He frequently reviewed acquisition-related

---

[5] *See* SEC Complaint at para. 158.
[6] *Id*. at paras. 160-64.

documents and had final approval over whether Unicoin entered into a proposed transaction.

Konanykhin frequently updated investors about Unicoin's purported real estate transactions through his Investor Updates.

Devlin supervised the legal team that reviewed and was responsible for conducting diligence on several of Unicoin's large purported real estate transactions; *he was typically aware of all proposed real estate transactions*.

As the executive in charge of Unicoin's branding and marketing strategy, *Moschini was involved in disseminating information about Unicoin's purported real estate transactions*: she oversaw Unicoin's social media strategy; reviewed the majority of Unicoin's social media posts; and was ultimately responsible for those posts and posts made on her personal social media accounts.

SEC Complaint, at paras. 164-72 (emphasis added).

52.    The 140% program played a critical role in Defendants' efforts to publicly portray the Certificates as safe, "asset-backed" investments. In reality, Defendants used the program to artificially inflate the value of its real estate portfolio and claim as closed properties that it never actually took title to:

Defendants repeatedly piled together these false and misleading statements to falsely claim, by the end of 2023, that Unicoin had acquired more than a hundred million dollars of real estate when, in fact, it had acquired no such assets; and *by the end of the first quarter of 2024 that Unicoin had acquired more than $1 billion of real estate when, in fact, the true figure was less than $1 million*.[7]

Emphasis added.

53.    In connection with the 140% program, Defendants made numerous misrepresentations and material omissions regarding four large property transactions between August 2023 and January 2024 in (1) Argentina, (2) Thailand, (3) Antigua, and (4) the Bahamas.

54.    Defendants publicly claimed that these four properties had appraised values ranging from $150 million to $680 million, for a combined total of more than $1.4 billion.

---

[7] *See* SEC Complaint at para. 157.

55.     However, Defendants knew or recklessly disregarded that they had no reasonable basis to represent that the properties were worth anywhere near as much as they claimed. In fact, the properties were worth only a small fraction of the amounts the Defendants claimed.

56.     Defendants also claimed that Unicoin had acquired the real properties at issue – with Defendant Devlin claiming that Unicoin had acquired the Bahamas properties – when, in fact, Unicoin had not (and, in all but one case, still has not) acquired these properties.

57.     **Argentina**. Between August 2023 and May 2024, Defendants Unicoin and Konanykhin made numerous false and misleading statements about mining rights concessions that Unicoin purportedly acquired in Argentina (the "Argentine Mining Rights").

58.     Defendants Unicoin and Konanykhin repeatedly represented to the public that the Argentine Mining Rights were valued at $150 million when, in fact, they knew or recklessly disregarded that the Company had not received an appraisal at the time it announced the acquisition and had no reasonable basis to publicly claim the Argentine Mining Rights were worth $150 million.

59.     In the August 16, 2023, press release announcing the transaction, Unicoin claimed, "Unicoin, an assets-backed cryptocurrency that addresses the extreme volatility of the crypto market, announced today that it signed an agreement with ... an Argentine corporation, to acquire from [it] the rights to explore and exploit mineral rights located in Argentina, primarily copper."

60.     That press release continued, "The purchase price shall be paid in unicoins. The acquisition is structured pursuant to Unicoin's program of acquiring real estate assets at 140% of their appraised value for unicoins, at an agreed value of $0.50 per unicoin. Unicoin Inc. agreed to pay [the Argentine company] 420,000,000 unicoins for the acquisition, a $210M value at the 50¢/ú [Unicoin token] price investors currently pay for unicoins."

61.    After the announcement of the Argentine Mining Rights transaction, Defendants Unicoin and Konanykhin repeatedly touted the purported total value of the transaction.

62.    For instance, on February 23, 2024, Unicoin posted a video to its LinkedIn page claiming that the Argentine Mining Rights were "part of our portfolio," had a "$150M investment value," and were part of the "$1.4Bn in assets" that "backed" Unicoin tokens.

63.    Also, on May 22, 2024, during a presentation at a digital assets conference in San Francisco, Unicoin's CFO claimed that in his role he was "focused on the actual asset values, or the appraisal values," of the properties Unicoin was acquiring through its "140% program," and highlighted Unicoin's acquisition of "$150 million mining rights in Argentina," showing a slide claiming that those rights had an "[a]ppraised value [of] $150M."

64.    These statements about the Argentine Mining Rights transaction were false for at least two reasons: (1) at that time, Unicoin had not obtained an appraisal of the Argentine Mining Rights; and (2) in fact, the Argentine Mining Rights were worth just a fraction of the value that Unicoin announced.

65.    At the time Unicoin claimed to have acquired the Argentine Mining Rights, Defendants had not received any appraisal for the property. Defendants would not receive an appraisal for the property until more than a year later, in November 2024.

66.    On November 4, 2024, nearly 15 months after Unicoin announced the Argentine mining rights acquisition, the Company received for the first time an appraisal of the Argentine Mining Rights. This appraisal valued the Argentine Mining Rights at $7.1 million—less than 5% of the $150 million that Unicoin had announced in August 2023 and repeatedly touted to the public through mid-2024.

67.    **Thailand.** Between September 2023 and May 2024, Defendants Unicoin and

Konanykhin made numerous false and misleading statements about a property that Unicoin purportedly had acquired in Thailand (the "Thailand Property").

68.    Defendants Unicoin and Konanykhin repeatedly represented to the public that the Thailand Property was valued at $241 million when, in fact, they knew or recklessly disregarded that the Company had not yet received an as-is appraisal of the Thailand Property, and the Thailand Property was actually worth far less than $241 million.

69.    At the time of Unicoin's statements the Thailand Property was worth no more than $15 million as-is.

70.    On August 22, 2023, the seller of the Thailand Property provided Defendant Dominguez with a so-called "appraisal" for the Thailand Property, valuing it at $241 million (the "Seller's Appraisal"), which Defendant Dominguez shared with Defendants Konanykhin and Moschini.

71.    However, this $241 million valuation in the Seller's Appraisal reflected the total anticipated cost of constructing a resort on the completely undeveloped Thailand Property, not an as-is market value for the property.

72.    In August 2023, the as-is market value of the Thailand Property was no more than $15 million.

73.    In fact, the Seller's Appraisal itself stated that the market value of the undeveloped Thailand Property was less than $10 million.

74.    Defendants Konanykhin and Dominguez knew that the Seller's Appraisal was based on an expected future cost of the constructed project, not the then-current market value of the Thailand Property.

75.    Notwithstanding the $10 million as-is valuation stated in the Seller's Appraisal,

Defendants Unicoin and Konanykhin announced and then repeatedly touted the Thailand Property transaction as a $335 million acquisition, implying a $241 million valuation after accounting for Unicoin's "140% program."

76.    For example, on September 29, 2023, Unicoin issued a press release announcing its acquisition of the Thailand property, headlined, "Unicoin Makes History with $335M Thailand Luxury Resort Acquisition, the Largest Ever Property-for-Crypto Deal."

77.    The September 29, 2023, press release stated that Unicoin had "signed a landmark $335 million agreement to purchase Eden Grand Resort, a development project for a 64,000 square meter property and luxury resort in Chonburi, Thailand – the largest-ever real estate acquisition made with cryptocurrency."

78.    The press release continued, "The purchase price shall be paid in unicoins. The acquisition is structured pursuant to Unicoin's program of acquiring real estate assets at 140% of their appraised value for unicoins. Unicoin Inc. agreed to pay [the Thailand Property seller] 671,206,755 unicoins for the acquisition, a $335.6M value at the 50¢/ú [Unicoin] price investors currently pay for unicoins."

79.    On October 2, 2023, Unicoin filed with the SEC a current report on Form 8-K, attaching the September 29, 2023, press release.

80.    Unicoin's September 29, 2023, Facebook post claimed that "Unicoin is expanding its global portfolio, acquiring the Eden Grand Resort in Thailand in the biggest-ever crypto-for-real estate deal at $335M!" It also included a video claiming, "Unicoin Makes History with $335M Thai Luxury Resort Acquisition."

81.    Defendants Unicoin and Konanykhin's statements about the Thailand Property acquisition were false and misleading because they materially inflated the value of the Thailand

Property that Unicoin claimed to have acquired. The inflated value was based on the anticipated cost of constructing a large resort complex rather than the property's market value at the time of the transaction.

82.    **Antigua.** In October 2023, Defendants Unicoin and Konanykhin made multiple false and misleading statements about two properties Unicoin purportedly had acquired in Antigua (the "Antigua Properties"). Defendants Unicoin and Konanykhin represented that the Antigua Properties were valued at $680 million when, in fact, as they knew or recklessly disregarded, the Company had not received an appraisal at the time it announced the acquisition, and serious doubts existed about the seller's claimed $680 million valuation for the Antigua Properties.

83.    Beginning in September 2023, pursuant to its "140% program," Unicoin engaged in discussions about acquiring the Antigua Properties – two adjoining parcels of land in Antigua and Barbuda that together combined into a 394.6-acre property – in exchange for Unicoin rights Certificates.

84.    During negotiations with Defendants Konanykhin and Dominguez, the seller's representative claimed that the Antigua Properties were worth $680 million. Dominguez has acknowledged that he had doubts about that claimed value.

85.    In fact, Defendants Dominguez and Konanykhin were aware or quickly learned of numerous red flags regarding the reliability of the purported $680 million valuation.

86.    The only support Antigua Properties seller's representative provided Dominguez and Konanykhin for his $680 million valuation was a two-page list of comparable properties that the seller's representative himself had compiled.

87.    On September 22, 2023, Konanykhin and Dominguez discussed in a WhatsApp chat other properties listed for sale in Antigua with much lower per-acre prices than the Antigua

Properties. Those other property listings suggested that the actual value of the Antigua Properties was less than $100 million. Among other things, on or before September 22, 2023, Dominguez and Konanykhin had become aware that a real estate agency had created an online listing in 2020 purporting to sell a 400-acre parcel of land in the same location in Antigua for $40 million.

88.    During his September 22, 2023, private discussion with Defendant Dominguez, Defendant Konanykhin noted that "the real value of what [the Antigua Properties seller's representative] offers may indeed be under $40M."

89.    On September 27, 2023, Defendant Dominguez shared with Defendant Konanykhin links to New York and Grenada court opinions showing that, in 2002, the Antigua Properties seller's representative had been disbarred as an attorney in New York and had been found to pose "an immediate threat to the public interest" after failing to respond to ten complaints of professional misconduct; and, in 2014, had been disbarred as an attorney in Grenada for failing to disclose the New York disbarment in his Granada bar application.

90.    Despite the red flags about the property's valuation and about the seller's representative, which had led Defendant Dominguez to contact an Antigua appraiser to obtain a price opinion (from whom he had not yet received a response), Defendant Konanykhin announced the acquisition of the Antigua Properties in an investor update on October 17, 2023.

91.    In the October 17, 2023, Investor Update, Konanykhin stated, "I just signed a deal for acquiring, in exchange for unicoins, 394.6 acres of premium coastal land in the Caribbean, valued at US$680M."

92.    Unicoin also promoted the acquisition to the public on its various social media platforms. For example, on October 23, 2023, the Unicoin Instagram account made a post claiming, "We've done it again – our biggest deal yet: 394.6 acres of premium coastal land in the

Caribbean, valued at US$680M!" An accompanying video touted a "$680M Coastal Caribbean Paradise Added to Our Assets!" The same post was made by the Company's LinkedIn and X accounts on the same day.

93.     On that same day, the local appraiser whom Dominguez contacted in Antigua informed him that the Antigua Properties were worth only $50 million. On October 30, 2023, Dominguez shared the $50 million price opinion with Konanykhin and also discussed with him a due diligence report that Konanykhin had separately requested, which, among other things, suggested a property value of between $59 and $392 million. Dominguez commented, "Wow, seems like too many issues with [the seller's agent] and land seems iffy."

94.     Defendants Unicoin and Konanykhin's claims that the Antigua Properties were worth $680 million were false and misleading because their actual market value at the time was no more than $89 million, and they did not disclose the red flags and lack of reasonable basis for the valuation.

95.     **Bahamas.** Between January and June 2024, Defendants made multiple false and misleading statements about Unicoin's purported acquisition of the beneficial ownership in two entities that claimed to own three properties in the Bahamas, purportedly valued at $396 million.

96.     Defendants repeatedly touted Unicoin's acquisition of the Bahamas properties, although they knew of or recklessly disregarded serious red flags about the sellers' actual ownership of the properties.

97.     Defendant Dominguez represented to the public that Unicoin had closed its acquisition of the Bahamas properties while knowing or recklessly disregarding that the transaction had not closed. To date, Unicoin has not closed on the acquisition.

98.     Defendant Devlin also highlighted the acquisition of the Bahamas properties in at

least one PPM while omitting material information concerning the serious red flags about the sellers' actual ownership of the properties and the incomplete status of the acquisition, both of which Defendant Devlin knew or should have known when he drafted the PPM.

99.     In July 2023, Defendants Konanykhin and Dominguez began a series of discussions and communications with the representative of sellers of property in the Bahamas regarding Unicoin's potential acquisition of those properties.

100.    Defendants Devlin and Moschini also participated in a WhatsApp group chat with the sellers' representative in which they were updated on the status of the acquisition as the negotiations progressed.

101.    The parties ultimately settled on Unicoin acquiring beneficial ownership in two entities, Long Island Investments Ltd. and Newport Harbour Ltd. (the "Bahamas Entities") – which purportedly owned three parcels of land located on Long Island, Cat Island, and Andros Island in the Bahamas – for a total of 7,721 acres (collectively, the "Bahamas Properties"), in exchange for Unicoin Rights Certificates.

102.    At the outset of their discussions to acquire the Bahamas Properties, Defendants Konanykhin and Dominguez became aware of red flags about the potential transaction, including prior allegations of fraud regarding the sellers and doubts about the sellers' actual ownership of the Bahamas Properties they were purporting to sell.

103.    In a September 8, 2023 WhatsApp conversation following a telephone conference call among Defendants Konanykhin, Dominguez, Devlin, Unicoin's CFO, the Bahamas Entities' representative, and an associate of the representative working on the transaction (the "Associate"), Defendant Dominguez sent Defendant Konanykhin a WhatsApp message containing a link to a press release issued by the United States Department of Justice ("DOJ Press Release"), which

identified the Associate as a convicted felon who had been sentenced in 2015 to 12.5 years in prison for defrauding more than 100 investors out of more than $8 million in a Bahamas land development scheme.

104.    Defendant Dominguez commented on the DOJ Press Release in an accompanying WhatsApp voice message to Defendant Konanykhin, stating: "[A]ll these guys sound pretty shady. They don't want to be on video, etc. And we already know [the Bahamas Entities' representative] is a little shady. So I went ahead and Googled them and there you go. Incredible. But I don't know. Definitely don't think we should do any business with these people…. They're gonna send us some proposition for $400 million worth of the land in the Bahamas. Who knows if they even own it."

105.    By December 12, 2023, the Bahamas Entities' representative shared appraisals for the Bahamas Properties with Konanykhin, Moschini, and Devlin. Information contained in the appraisals raised serious concerns about whether the Bahamas Entities held marketable title to the properties.

106.    For example, although the Bahamas Entities' representative claimed that the Cat Island property was a vacant parcel of land, the appraisal for that property stated there were "several residences[,] government offices, a bank[,] and convenience stores" already located on the Cat Island property; that "many of the residents" on the Cat Island parcel "claim[ed] that they had been given the land and resided on it for many years"; and that, "many roads were also cut into the property as if [it had] been sold for subdivision use."

107.    In a November 27, 2023, group chat with, among others, Defendants Konanykhin, Moschini, and Devlin, Defendant Dominguez alluded to the title issues discussed above, stating, "[W]e have not received anything from a registry [i]n Bahamas showing true ownership of [l]and. They mentioned that doesn't exist in BAHAMAS. I indeed find that hard to believe and a bit

shady."

108.    Nonetheless, Unicoin conducted little or no additional investigation into who held title to the Bahamas Properties before announcing the transaction.

109.    On January 24, 2024, despite the red flags discussed above and known to Defendants, Unicoin signed an agreement with the Bahamas Entities to acquire the Bahamas Properties.

110.    On February 1, 2024, Unicoin issued a press release announcing that it had entered into an agreement to acquire beneficial ownership interests in the Bahamas Entities (and, in turn, beneficial ownership of the Bahamas Properties) (the "Bahamas Properties Press Release").

111.    The Bahamas Properties Press Release was entitled, "Unicoin Inc. Announces the Acquisition of Land Holdings in the Bahamas via the Largest-ever Crypto Deal in Real Estate, Valued at $554M."

112.    In fact, the market value of the Bahamas Properties at the time of the acquisition was no more than $132 million.

113.    The Bahamas Properties Press Release also claimed that the purported acquisitions "represent Unicoin's commitment to aggressively acquire tangible, income-generating assets. As the company continues its remarkable rise, the possibilities remain boundless. This record-shattering deal cements Unicoin's status as an unstoppable crypto pioneer, forging the future of finance."

114.    Defendants Konanykhin and Moschini approved the Bahamas Properties Press Release before the Company issued it.

115.    The Company's social media accounts also immediately began to tout Unicoin's purported acquisition of the Bahamas Properties.

116.    For example, a February 2, 2024, post on Unicoin's official Instagram account announced, "the acquisition of beneficial ownership interest in companies holding prime land holdings in the Bahamas," in what the post claimed was "the largest-ever cryptocurrency real estate deal in history." An accompanying video claimed that the deal "propell[ed] the total value of our portfolio to $1.4 billion."

117.    Defendant Konanykhin also touted the Company's acquisition of the Bahamas Properties in his Investor Updates.

118.    For example, in a February 2, 2024, Investor Update entitled "Unicoin makes a $554M deal, setting a new record," Defendant Konanykhin stated that he was "pleased to share with you a news report about our new record-shattering deal."

119.    Defendant Devlin also highlighted the acquisition in an April 26, 2024, PPM he drafted relating to Unicoin's general sale of its common stock (the "April 26, 2024, PPM"). In the April 26, 2024, PPM, Defendant Devlin stated that "[o]n April 2, 2024, the Company indirectly acquired beneficial ownership of 7,721 acres of land located in the Bahamas, including Long Island and Andros Island, by purchasing all of the issued and outstanding shares of each of Long Island Investments Ltd. and Newport Harbour Ltd., the owners of the land."

120.    These statements regarding Unicoin's acquisition of the beneficial ownership to the Bahamas Entities – and thus to the Bahamas Properties – failed to disclose that the Bahamas Entities were connected to prior land frauds; that several of the Defendants had doubts about whether the Bahamas Entities owned the Bahamas Properties; and that the appraisals provided to Unicoin for the Bahamas Properties raised serious questions about whether the Bahamas Entities held marketable title to the Bahamas Properties.

121.    In addition, Defendants Dominguez and Devlin falsely represented that the

Bahamas Properties acquisition was closed, even as Dominguez knew or recklessly disregarded, and Devlin knew or should have known that it was not.

122.    For his part, at the March 26, 2024, Unicoin annual shareholders' meeting, Defendant Dominguez told Unicoin shareholders that the acquisition of the Bahamas Entities was closed and that it would appear in Unicoin's financial statements in its 1Q2024 10-Q.

123.    In fact, as of March 26, 2024, Unicoin's purported acquisition of the Bahamas Properties had not closed. Indeed, the previous day (March 25, 2024), Dominguez had told Unicoin's CFO that the Bahamas acquisition had not yet closed.

124.    These statements regarding Unicoin having purportedly completed its acquisition of the Bahamas Property were false, as the acquisition has still not closed.

**Plaintiff German Arochi's Experiences with Unicoin, Inc.**

125.    On or about September 1, 2023, Plaintiff German Arochi invested $2,000 in a "Unicoins Presale Certificate" ("Unicoin Rights Certificate"), granting him the right to receive 4,000 Unicoin Tokens at an unspecified later date.

126.    Pursuant to an accompanying "Unicoins Token Presale Agreement" ("Token Presale Agreement"), the future Unicoin Tokens allocated to Plaintiff would be valued at $0.50 each.

127.    The Unicoin Rights Certificate and Token Presale Agreement were both signed by Konanykhin in his capacity as CEO of Unicoin, Inc.

128.    The Token Presale Agreement states that Certificate holders will receive their Tokens only once "development and all necessary technical, legal and regulatory prerequisites have been met."

129.    As of the filing of this action, Plaintiff has not received any Unicoin Tokens.

130.    Shortly after Plaintiff purchased the Unicoin Rights Certificate in September 2023, he learned about the 140% program that encouraged investors to transfer their real estate assets to Unicoin in exchange for Unicoin Rights Certificates.

131.    As a result of Defendants' relentless marketing campaign, Plaintiff was induced to enter into an Asset Swap Agreement for the transfer of a residential property he owned in Mérida, Yucatán (the "Mérida property") to Unicoin in exchange for Certificates under the Company's 140% program.

132.    Under the terms of the "Asset Swap Agreement," Unicoin would provide Plaintiff with the Certificates entitling him to 3,578,400 Unicoin Tokens in exchange for the Mérida property. Unicoin determined the number of Tokens offered to Plaintiff by using its bogus 140% formula, as shown in the table below:

| | | |
|---|---|---|
| ***The Mérida Property*** | Original Appraisal Value | $1,278,000.00 |
| | 40% of Original Appraisal Value | $  511,200.00 |
| | Value Under 140% Program (USD) | $1,789,200.00 |
| ***Unicoin Tokens*** | Value Per Token | $        0.50 |
| | Mérida Property Value (Unicoin Tokens) | 3,578,400 |

133.    Acting under the belief that the Certificates constituted a legitimate investment opportunity, Plaintiff signed the "Asset Swap Agreement" on December 13, 2023.

134.    The Mérida property was never transferred to Unicoin, as the Company backed out of the transaction in the spring of 2025. Plaintiff did not receive any Certificates or Unicoin Tokens at any point before, during, or after execution of the "Asset Swap Agreement."

135.    Although Unicoin never took possession of Plaintiff's property, the Company's financial records still included the appraised value of the Mérida property as part of its real estate portfolio.

136.    Unicoin's actions concerning Plaintiff's non-transferred property track with the Company's pattern of "claim[ing] as closed real-property transactions that continued to have contingencies outstanding." These falsely recorded transactions accounted for a significant portion of Unicoin's purported "$1 billion" real estate holdings.[8]

137.    Between September 2023 and July 2025, Plaintiff lost approximately $150,000 in connection with the cancelled property transfer.[9] Plaintiff's specific losses arising out of the non-transfer of his property are detailed below:

| Mérida Property Expenses | Estimated Amount (USD) |
|---|---|
| Legal Fees - Plaintiff's Attorney | $ 4,000.00 |
| Legal Fees - Notary Public | $ 1,400.00 |
| Fiscal and Asset Accounting | $ 7,200.00 |
| Lost Rental Income (September 2023 - July 2025) | $ 131,250.00 |
| Property Tax | $ 2,500.00 |
| Maintenance Fees - Yucatan Country Club | $ 7,500.00 |
| Cleaning/General Maintenance Services | $ 13,750.00 |
| Travel Expenses (Meetings w/ Alex Dominguez in Miami) | $ 3,962.00 |
| Total Estimated Expenses | $ 171,562.00 |

**Unicoin Investors Fell Victim to a Massive Fraud**

138.    From February 2022 to the present, the Unicoin, Konanykhin, Moschini, and Dominguez (referred to as the "Promoting Defendants" in the SEC Complaint) raised more than $100 million from investors through a scheme the SEC described as a "massive securities offering fraud." Specifically, the SEC alleged that Defendants repeatedly made false and misleading statements and material omissions across multiple public forums to convince more than 5,000 investors to purchase unregistered securities in the form of Unicoin Rights Certificates.

---

[8] *See* SEC Complaint at paras. 156-57.
[9] Amounts were originally invoiced in Mexican pesos and converted at an approximate exchange rate of 17.20 MXN/USD.

139.    These false statements supported a fraudulent scheme designed to portray the Certificates as investments in safe, stable, profitable, and in-demand cryptocurrency assets. Defendants' false statements included four interconnected categories of misrepresentations:

- *First*, the Promoting Defendants **misled investors about the fundamental attributes of Unicoin tokens and Unicoin Rights Certificates**—the very attributes that they claimed made these investments so attractive.

- *Second*, the Promoting Defendants **repeatedly and falsely claimed that real estate Unicoin had purportedly acquired to "back" the Unicoin tokens was worth billions of dollars**. In fact, not only did Unicoin never take title to most of the properties they claimed to have acquired, but the Promoting Defendants also vastly overstated the values of the properties.

- *Third*, throughout the Relevant period, the **Promoting Defendants repeatedly overstated the Company's sales of Unicoin Rights Certificates**, creating the illusion of robust investor interest. Among other things, the Promoting Defendants made dozens of statements on social media and in investor communications, paid advertisements, and speaking engagements touting fundraising "milestones," each of which substantially overstated the Company's Unicoin Rights Certificate sales and fundraising success.

- *Fourth*, the Promoting Defendants **misrepresented the Company's financial condition**, claiming it had a "runway" (or cash flow to continue operating) measured in "decades" or even "centuries."

Defendants routinely repeated these false and/or misleading statements to the public during speaking engagements, investor meetings, press conferences, and public appearances, as well as through multi-million-dollar paid media and advertising campaigns.

140.    Defendant Devlin made and repeated the above false and misleading statements in PPMs Unicoin used to offer and sell the Certificates and shares of its common stock.

141.    The SEC Complaint refers to an unidentified paid media platform that also made false and misleading statements about and on behalf of Unicoin through its production and distribution of promotional content for the Company. This anonymous media platform is believed to be Benzinga for the following reasons.

- Unicoin's website linked to a press release touting the launch of the Company's "strategic partnership" with Benzinga on November 3, 2023.[10] Through this partnership, Unicoin served as the lead sponsor of Benzinga's "Fintech Deal Day and Awards" weekend, held in mid-November 2023.

- The plaintiff in an unrelated civil suit alleging Unicoin and Konanykhin violated New York employment law stated he helped Unicoin secure the title sponsorship for the Fintech Deal Day and Awards, "along with substantial media coverage from Benzinga as part of the agreement."[11]

**Defendants Falsely Represented that the Certificates were SEC-Registered**

142.    Throughout the Relevant Period, Unicoin, Konanykhin, Moschini, and Dominguez falsely claimed that the Certificates and tokens were "SEC-registered," "U.S.-registered," or "SEC-compliant."

143.    However, the Certificates were never registered with the SEC, and Unicoin never filed a Securities Act registration statement for its investment offerings.

144.    Defendants employed various means of interstate communication to sell and solicit Unicoin Rights Certificates. For example, Unicoin's paid marketing program targeted investors across the United States and abroad and included (i) high-visibility digital billboards in public spaces such as Times Square, the entrance to New York's Holland Tunnel, and airports in New York, San Francisco, Los Angeles, Denver, and Miami; (ii) television ads on CNBC, Bloomberg, Fox Business, and CNN; (iii) advertisements on high-traffic news media websites such as The

---

[10] *See* "Benzinga and Unicoin join forces to revolutionize the future of digital assets," available at https://unicoin.com/news/benzinga-and-unicoin-join-forces-to-revolutionize-the-future-of-digital-assets; Benzinga also promoted the partnership on its verified Instagram profile: https://www.instagram.com/reel/CzH0E0_NB1A/?utm_source=ig_web_copy_link.

[11] Complaint at 3, *DiFonzi v. Unicoin, Inc. et al.*, 1:25-cv-02600 (S.D.N.Y. March 28, 2025).

New York Times, The Dallas Morning News, the Chicago Tribune, the Los Angeles Times, The Inquirer, The Wall Street Journal, Bloomberg, Axios, CNN, MarketWatch, USA Today, and Fox Business; and (iv) paid advertisements on social media platforms such as Facebook, Instagram, and X.

145.    Defendants Moschini and Dominguez made numerous public statements touting the Certificates, their potential for profit, and encouraging the purchase of the Certificates in order to further their own financial interests.

**Defendants Misrepresented Material Information Concerning the Certificates**

146.    Defendants omitted and misrepresented material information in connection with their solicitation of consumers to purchase the Certificates.

147.    Defendants knowingly made false statements, some of which were forward-looking, with a reckless disregard for their truth.

148.    Defendants willfully omitted information that would have been deemed by a reasonable investor essential to have when buying Unicoin Rights Certificates. Such information includes, *inter alia*:

a.    Intentionally mischaracterizing and misrepresenting Unicoin Rights Certificates and Unicoin tokens as highly profitable "asset-backed" and "SEC-registered" securities.

b.    Vastly overstating the amount and value of total Unicoin Rights Certificates sold through exaggerated "milestone" fundraising announcements.

c.    Artificially inflating the actual value of Unicoin's real estate holdings through various means, including the 140% program and numerous "record-breaking" acquisitions of international properties that the Company never actually took title to.

d.      Publicly misrepresenting Unicoin's financial condition by assuring investors and potential investors that the Company's "runway" would allow it to continue operating for "decades" or even "centuries."

149.    As a direct result of Defendants' solicitation, offer, and sale of unregistered securities through omissions and misrepresentations of material information, Plaintiff and the Class – many of whom are believed to be retail investors and lack the technical and financial sophistication necessary to have evaluated the risks associated with their investments in Unicoin Rights Certificates and were denied information that would have been contained in the materials required for the registration of Unicoin Rights Certificates – have suffered significant damages.

**Unicoin and Konanykhin Continue to Perpetuate the Fraudulent Scheme**

150.    From May 2025 to the present, Konanykhin has made a concerted effort to publicly defend the legitimacy of Unicoin's unregistered securities offering scheme.

151.    On June 5, 2025, Konanykhin appeared as a guest on the Fox Business channel to address the SEC's allegations against Unicoin. At the outset of the interview, Konanykhin framed the SEC Complaint as part of a broader "lawfare attack" on the cryptocurrency industry coordinated by former SEC Chair Gary Gensler.[12]

152.    Throughout the interview, Konanykhin repeated many of the same material misrepresentations that formed the basis of the SEC Complaint.

a.      In response to a question about the assets purportedly "backing" Unicoin's securities offerings, Konanykhin asserted that "the volume of real estate committed to Unicoin has exceeded the numbers we shared with the public," and that the Company "maintained "$3 billion in real estate commitments."

---

[12] The video is available at https://www.foxbusiness.com/video/6373902754112.

    b.     Konanykhin again described the prospective Unicoin tokens as "the most compliant cryptocurrency in the United States."

    c.     Konanykhin also continued to portray Unicoin tokens as a potential "trillion-dollar cryptocurrency" and a "more modern, more scalable, more energy and cost efficient" alternative to Bitcoin.

153.    At some point after the filing of the SEC Complaint, Unicoin updated its website to include a page dedicated to pushing back against the federal government's "persecution" of the Company.[13]

154.    The "persecution" page prominently features links to statements made by Unicoin's attorneys and Company co-founder Silvina Moschini. Moschini's statement, initially published on her LinkedIn profile, echoes many of the materially inaccurate talking points Konanykhin made in his Fox Business interview.

---

[13] *See* "SEC's persecution of Unicoin: Unconstitutional War on Crypto," available at https://unicoin.com/persecution.



**Silvina Moschini** in · 2nd
Entrepreneur Democratizing Wealth Creation and Opportun...
2mo · Edited · 🌐

Dear investors and global supporters,

Today, I stand before you to expose a systematic and calculated assault on entrepreneurship, innovation, and the fundamental principles of fair business practices.

By waging lawfare against Unicoin, that began by Gensler's administration at the Securities and Exchange Commission (SEC) is damaging the very essence of the American entrepreneurial spirit.

Let me be unequivocally clear:

The SEC's lawsuit against Unicoin is nothing more than a fabricated and vengeful persecution designed to:
· Destroy a pioneering cryptocurrency company
· Undermine technological innovation
· Intimidate entrepreneurs who challenge the status quo

Our Compliance Credentials:
· Publicly reporting company for three consecutive years
· Fully audited financial statements for five years
· Passed two exhaustive SEC investigations with flying colors
· Unprecedented transparency in the cryptocurrency industry
· Aligned with the President's vision of making the United States the global capital of crypto

155.    The webpage also includes a subsection labeled "Frequently Asked Questions," which describes the lawsuit against Unicoin as "an ongoing, politically motivated campaign – referred to as the 'War on Crypto' – aimed at stifling innovation in the blockchain space and punishing companies that challenge outdated regulatory frameworks."

156.    On June 24, 2025, Unicoin issued a press release announcing its acquisition of Diamond Lake Minerals, Inc. ("DiamondLake"), a public cryptocurrency company "specializing

in the development of digital assets and SEC-registered security tokens."[14]

157.    In a subsequent investor update released in July 2025, Konanykhin presented the DiamondLake acquisition as an alternative to Unicoin's "original strategy of getting listed on NYSE and crypto exchanges in 2024" and a "***new market opportunity which may lead us to a $100B+ valuation***" (emphasis added).[15]

158.    The proposed DiamondLake acquisition never came to fruition. On September 15, 2025, Unicoin announced in an email from Konanykhin to investors that the deal was off because, purportedly, "DiamondLake failed to comply with the terms of our Agreement," and "insisted on receiving additional benefits from us." Konanykhin's email then pivots to purported "good news" about an unspecified "deal designed to provide us with resources sufficient to resume our momentum, brutally interrupted by the the [*sic*] SEC lawfare 16 months ago."

## CLASS ALLEGATIONS

159.    Plaintiff brings this class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired the Unicoin Rights Certificates during the relevant period (the "Class Period"). Excluded from the Class are corporate officers, members of the boards of directors, and senior executives of Defendants; members of their immediate families and their legal representatives, heirs, successors or assigns; and any entity in which Defendants have or had a controlling interest.

160.    The members of the Class are so numerous that joinder of all members is

---

[14] *See* Press Release, Unicoin Signs Agreement to Acquire Controlling Stake in Diamond Lake, Expanding into Digital Asset Treasury Business, available at https://www.nasdaq.com/press-release/unicoin-signs-agreement-acquire-controlling-stake-diamondlake-expanding-digital-asset.
[15] The investor update is archived at https://araneoides.eocampaign1.com/web-version?ep=2&lc=8d213538-e3d7-11ef-aad5-9bb30307bb80&p=0aafd048-502c-11f0-9104-97502f53332f&pt=campaign&t=1750682802&s=61c6a1aaab4cb42a13715baace8ff26c6e9695dd7e24ce7ff7a80f91792328c1.

impracticable. Throughout the Class Period, Defendants sold Unicoin Rights Certificate investments to thousands of individual investors, raising more than $100 million for the Company. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds of members in the proposed Class. Members of the Class may be identified from records maintained by Defendants and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

161.   Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of the laws complained of herein.

162.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class litigation.

163.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.      Whether Defendants' marketing campaign for the Unicoin Rights Certificates violated applicable law; and

b.      to what extent the members of the Class have sustained damages and the proper measure of damages.

164.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively modest, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the

wrongs done to them. There will be no difficulty in the management of this action as a class action.

165.    In the absence of a class action, Defendants will – contrary to public policy – retain the benefits of their wrongful conduct described herein.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of the New York Deceptive Acts and Practices Act
### N.Y. Gen. Bus. Law § 349
### (Against All Defendants)

166.    Plaintiff realleges and incorporates the allegations set forth herein as if fully stated herein.

167.    Plaintiff purchased the Unicoin Rights Certificates and has been subjected to Defendants' scheme to mislead and deceive the marketplace and asserts this claim on behalf of the Class. At the time of the purchase, Plaintiff did not know of the vast deception in Defendants' marketing campaign for the Unicoin Rights Certificates, and accordingly paid a premium for the Certificates.

168.    Defendants engaged in deceptive and unfair practices prohibited by New York General Business Law § 349, including, among other things, misleading Plaintiffs and others into believing that the Certificates were stable, legal crypto assets backed by billions of dollars in real estate and other assets. Defendants took advantage of Plaintiffs' trust and confidence by deceptively promoting the sale of the Certificates and misrepresenting their key attributes and sales figures.

169.    Defendants' materially misleading promotion of the Certificates renders those promotions and communications unlawful.

170.    The unfair and deceptive trade acts and practices of Defendants are consumer-oriented, are materially misleading, and have directly, foreseeably, and proximately caused

damages and injury to Plaintiff and the other members of the Class.

171.    As a direct consequence of Defendants' unfair conduct and deception, Plaintiff and members of the Class have been damaged in that they spent money on the Certificates that they would not have otherwise spent. In addition, Plaintiff and members of the Class did not receive a lasting value for the Certificates, which Defendants misrepresented and are substantially worthless.

172.    Defendants' acts and practices amount to acts, uses, or employment by Defendants of deception and unfair commercial practices, false pretenses, false promises, misrepresentations, or the knowing concealment, suppression, or omission of material facts with the intent that others rely upon such concealment, suppression, or omission, in violation of New York General Business Law § 349, deeming deceptive and unfair acts and practices illegal.

<u>COUNT II</u>
**Violations of the New York False Advertising Act**
**N.Y. Gen. Bus. Law § 350**
**(Against All Defendants)**

173.    Plaintiff repeats and realleges each of the allegations set forth herein as if fully stated herein.

174.    Throughout the Class Period, Defendants were engaged in the "conduct of business, trade or commerce," within the meaning of N.Y. Gen. Bus. Law § 350, the New York False Advertising Act ("NY FAA").

175.    The NY FAA makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 350.

176.    Defendants caused to be made or disseminated throughout New York and beyond, statements that were untrue or materially misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers, including Plaintiffs and the other members of the Class.

177.    Defendants violated the NY FAA, as Defendants deceptively and misleadingly marketed Certificates as stable, legally compliant, and asset-backed, none of which was true and when, in reality, the Certificates were substantially worthless.

178.    Had Plaintiffs and the Class known the truth, they would not have purchased the Certificates at the prices they did, or at all.

179.    Accordingly, Plaintiffs and the Class overpaid for the Certificates and did not receive the benefit of the bargain for these assets.

**COUNT III**
**Unjust Enrichment**
**(Against All Defendants)**

180.    Plaintiff repeats and realleges each of the allegations set forth herein as if fully stated herein.

181.    All Defendants were enriched at the expense of Plaintiff and the Class in that they received benefits, commissions, fees, and other monetary benefits from the invalid sale of unregistered Unicoin Rights Certificates to investors and engaged in improper related party transactions and conflicts of interest to the detriment of investors, as alleged herein.

182.    It is against equity and good conscience to permit Defendants to retain such benefits, commissions, fees, and personal benefits resulting from the sale of the Certificates to investors.

183.    Defendants' receipt of such benefits as a result of inducing Plaintiff and the Class to invest in the Certificates are not governed by any contract between investors and Defendants.

184.    Defendants' unjust enrichment damaged the Plaintiff and the Class, and Defendants seek disgorgement, restitution, and the return of the funds they invested in the Certificates, as well as the commissions, fees, and other benefits retained by Defendants, which equity and good

conscience make it improper for Defendants to retain.

## COUNT IV
### Negligent Misrepresentation
### (Against All Defendants)

185.    Plaintiff repeats and realleges each of the allegations set forth herein as if fully stated herein.

186.    Defendants publicly and intentionally represented Unicoin Rights Certificates as valuable, sought-after "next generation" investments backed by "billions of dollars" in real estate and equity interests in promising startup companies. By so doing, Defendants incurred a corresponding common law duty to impart accurate information about the fundamental attributes and registration status of Unicoin Rights Certificates and Unicoin tokens to Plaintiff, other Class members, and all other non-insider potential investors in Unicoin Rights Certificates.

187.    Defendants violated that duty by providing false information about material aspects of Unicoin Rights Certificates, upon which Plaintiff and other members of the proposed Class reasonably relied to purchase the Certificates at artificially inflated prices. As a direct result, Plaintiff and other members of the Class suffered damages.

188.    Defendants failed to exercise reasonable care in the course of providing and communicating false information about material aspects of the Certificates to Plaintiff and the Class.

189.    Plaintiff and other members of the Class are entitled to damages in an amount to be determined at trial, along with interest, attorneys' fees, litigation costs, and such other relief as may be available.

## COUNT V
### Breach of Fiduciary Duty
### (Against Defendants Konanykhin and Moschini)

190.    Plaintiff repeats and realleges each of the allegations set forth herein as if fully stated herein.

191.    Defendants Konanykhin and Moschini were, at all relevant times, control persons, managers, general managers, and majority owners of Unicoin, Inc., and owed a fiduciary duty to Plaintiff and the Class.

192.    Plaintiff and the Class were entirely dependent upon Defendants Konanykhin and Moschini's ability, skill, knowledge, and goodwill to invest their money appropriately and thereafter diligently oversee and manage that money. Plaintiff and the Class certified by signing the Certificates and Token Purchase Agreements that they recognized these Defendants as their fiduciaries.

193.    Moreover, by virtue of their superior skill and knowledge, their discretion in investing the investors' money, their exclusive oversight of the investors' money, and the fact that Plaintiff and the Class entrusted them with their money, Defendants Konanykhin and Moschini were the investors' fiduciaries.

194.    Defendants Konanykhin and Moschini breached their fiduciary duties to Plaintiff and the Class by failing to truthfully, accurately, and completely disclose: (i) the potential profitability, functionality, and value of Unicoin Rights Certificates and Unicoin tokens; (ii) the risks associated with investing in Unicoin Rights Certificates and Unicoin tokens, including regulatory risks and potential lack of liquidity; (iii) their misleading statements about the Company's financial health, business prospects, and future growth opportunities; (iv) the actual value of Unicoin's real estate assets; and (v) their statements about the repeatedly postponed

Unicoin token initial coin offering.

195.    As a direct and proximate consequence of Defendants Konanykhin and Moschini's conduct as described in the foregoing and throughout this Complaint, Plaintiff and the Class have lost the money they invested in Unicoin Rights Certificates. As a result of Defendants Konanykhin and Moschini's breaches of fiduciary duty, Plaintiff and the Class have suffered damages in an amount to be determined at trial.

## COUNT VI
**Common Law Fraud and Fraudulent Inducement**
**(Against All Defendants)**

196.    Plaintiff repeats and realleges each of the allegations set forth herein as if fully stated herein.

197.    As set forth herein, Defendants made materially false representations of fact about Unicoin Rights Certificates and Unicoin tokens to Plaintiff, the members of the Class, and to the investing public generally.

198.    Defendants knew that those material representations were false when made.

199.    Defendants intended for Plaintiff and other investors to rely on their false representations, and they intended to defraud them thereby.

200.    Plaintiff and other members of the Class reasonably relied on Defendants' false representations to purchase Unicoin Rights Certificates at artificially inflated prices.

201.    As a direct result, Plaintiff and other members of the Class suffered damages.

202.    Defendants' misconduct involved high moral turpitude and was aimed at the public generally.

203.    Plaintiff and the Class are entitled to damages and punitive damages in amounts to be determined at trial, along with interest, attorneys' fees, litigation costs, and such other relief as

may be available.

## COUNT VII
### Aiding and Abetting Fraud
### (Against All Defendants)

204.    Plaintiff repeats and realleges each of the allegations set forth herein as if fully stated herein.

205.    As alleged herein, all Defendants have committed fraud with respect to the offering, solicitation, promotion, and sale of the unregistered Unicoin Rights Certificates.

206.    As alleged herein, all Defendants had knowledge of the fraud and substantially assisted in the achievement of the fraud.

207.    Each Defendant, with knowledge of the fraud, aided and abetted the other Defendants in perpetrating the fraud.

208.    As a direct result of each Defendant's aiding and abetting the fraud of the other Defendants, Plaintiff and the Class suffered damages in an amount to be determined at trial, and seek punitive damages.

## COUNT VIII
### Aiding and Abetting Breach of Fiduciary Duty
### (Against All Defendants)

209.    Plaintiff repeats and realleges each of the allegations set forth herein as if fully stated herein.

210.    As alleged herein, Defendants Konanykhin and Moschini breached their fiduciary duties to Plaintiff and the Class.

211.    By orchestrating the offering and sale of unregistered securities without a valid exemption from registration, all Defendants knowingly assisted and participated in the breaches of fiduciary duty by Defendants Konanykhin and Moschini.

212.    As a direct result of each Defendant aiding and abetting the other Defendants' breaches of fiduciary duty, Plaintiff and the Class suffered damages in an amount to be determined at trial.

**COUNT IX**
**Breach of Contract**
**(Against Defendant Unicoin)**

213.    Plaintiff repeats and realleges each of the allegations set forth herein as if fully stated herein.

214.    The terms of the Unicoin Rights Certificates and Token Purchase Agreements constitute a contract between: (1) Plaintiff and the Class Members, and (2) Unicoin, Inc.

215.    The contract was entered into by and between Unicoin and each Class Member between February 7, 2022, and the present.

216.    The terms of the Unicoin Rights Certificates and Token Purchase Agreements called for an investment of fiat currency or cryptocurrency by Plaintiff and the Class Members.

217.    The funds paid by Plaintiff and the Class Members pursuant to the Unicoin Rights Certificate investments were pooled by Unicoin in an effort by the Company to secure a profit for itself and the investors. As a result, the investors, including Plaintiff and the Class, shared in the risks and benefits of the investment.

218.    Plaintiff and the Class Members relied on, and are dependent upon, the expertise and efforts of Unicoin for their investment returns.

219.    The terms of the Unicoin Rights Certificates and Token Purchase Agreements constitute an investment contract and are therefore subject to federal and state securities laws, including the registration requirements promulgated under these laws.

220.    Unicoin breached its contracts with Plaintiff and the Class by failing to provide

Unicoin tokens, or any digital asset/cryptocurrency, and/or any refund to investors pursuant to the terms of the Unicoin Rights Certificates and Token Purchase Agreements.

221.    No registration statement has been filed or is in effect with any federal or state regulatory body, and no exemption from registration exists with respect to the Unicoin Rights Certificates.

222.    By virtue of the foregoing, Unicoin is liable to Plaintiff and the Class for damages resulting from Unicoin's breaches of contract.

223.    To the extent that Plaintiff has received from Unicoin any benefits through the contract, though none are known to them at this time, Plaintiff hereby offers to restore to Unicoin those benefits, once they are identified and can be quantified.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class, prays for relief as follows:

a.    Determining that this action may be maintained as a class action, that Plaintiff be named as Class Representative of the Class, that the undersigned be named as Class Counsel of the Class, and direct that notice of this action be given to Class members

b.    That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the laws set forth above;

c.    Determining that Defendants are jointly and severally liable on all causes of action asserted herein;

d.    Ordering Defendants to pay monetary damages to Plaintiff and the Class;

e.    Awarding Plaintiff direct and consequential damages, including prejudgment interest;

f.    Ordering Defendants to disgorge all principal, interest, and fees Plaintiff and the

Class paid to Defendants in connection with the Unicoin Rights Certificate investments and any other equitable relief that this Court may deem appropriate and just;

g.    Awarding Plaintiff their attorney's fees and costs incurred in this action; and

h.    Awarding any and all other relief, in law or equity, as this Court may deem appropriate and just proper under the circumstances.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury for all claims that may be so tried.

Dated this 4th day of November, 2025.

By: */s/ Marc H. Edelson*
**EDELSON LECHTZIN LLP**
Marc H. Edelson, Esq.
Eric Lechtzin, Esq.*
411 S. State Street, Suite N-300
Newtown, Pennsylvania 18940
Telephone: (215) 867-2399
Email: medelson@edelson-law.com
Email: elechtzin@edelson-law.com

*Attorneys for Plaintiff and the Proposed Class*

*Admission pro hac vice anticipated.